**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**June 28, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

_____

JUSTIN HOOPER,

     Plaintiff - Appellant,

v.

THE CITY OF TULSA,

     Defendant - Appellee.

------------------------------

CHEROKEE NATION; CHICKASAW
NATION; CHOCTAW NATION OF
OKLAHOMA; QUAPAW NATION;
SEMINOLE NATION OF OKLAHOMA;
MUSCOGEE (CREEK) NATION; STATE
OF OKLAHOMA; OKLAHOMA
ASSOCIATION OF MUNICIPAL
ATTORNEYS,

     Amici Curiae.

No. 22-5034

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:21-CV-00165-WPJ-JFJ)**
_____

John M. Dunn, The Law Offices of John M. Dunn, PLLC, Tulsa, Oklahoma, for
Plaintiff – Appellant.

Kristina L. Gray, Litigation Division Manager (Becky M. Johnson, Criminal Division
Manager; R. Lawson Vaughn, Senior Assistant City Attorney; Hayes T. Martin, Assistant
City Attorney, with her on the brief), Tulsa, Oklahoma, for Defendant – Appellee.

Anthony J. Ferate (Andrew W. Lester, Courtney D. Powell, John E. Dorman, with him on the brief), Spencer Fane LLP, Oklahoma City, Oklahoma, for Amicus Oklahoma Association of Municipal Attorneys.

Riyaz A. Kanji, Kanji & Katzen, P.L.L.C., Ann Arbor, Michigan, appeared on behalf of Amici Muscogee (Creek) Nation, Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, Quapaw Nation, and Seminole Nation of Oklahoma. (David A. Giampetroni, Kanji & Katzen, P.L.L.C., Ann Arbor, Michigan; Geri Wisner, Attorney General, and Kevin W. Dellinger, Assistant Attorney General, Okmulgee, Oklahoma, with him on the brief for Amicus Curiae Muscogee (Creek) Nation).

Frank S. Holleman, Sonosky, Chambers, Sachse, Endreson & Perry, LLP, Bonita, California, for Amici Cherokee Nation, Chickasaw Nation, and Choctaw Nation of Oklahoma; Sara Hill, Attorney General, Cherokee Nation, Tahlequah, Oklahoma, for Amicus Cherokee Nation; Stephen H. Greetham, Senior Counsel, Chickasaw Nation, Oklahoma City, Oklahoma, for Amicus Chickasaw Nation; Brian Danker, Senior Executive Officer, Division of Legal & Compliance, Choctaw Nation of Oklahoma, Durant, Oklahoma, for Amicus Choctaw Nation of Oklahoma; Robert H. Henry, Robert H. Henry Law Firm, Oklahoma City, Oklahoma, for Amicus Quapaw Nation; Valerie Devol, Attorney General, Devol & Associates, Edmond, Oklahoma, for Amicus Seminole Nation of Oklahoma, filed a brief for Amici Curiae The Cherokee Nation, Chickasaw Nation, Chocktaw Nation of Oklahoma, Quapaw Nation, and Seminole Nation of Oklahoma.

Zach West, Solicitor General, Bryan Cleveland, Deputy Solicitor General, Oklahoma City, Oklahoma, filed a brief for Amicus Curiae State of Oklahoma.

————————————————————

Before **McHUGH**, **EID**, and **CARSON**, Circuit Judges.

————————————————————

**McHUGH**, Circuit Judge.

————————————————————

Justin Hooper and the City of Tulsa dispute whether the Curtis Act, 30 Stat.

495 (1898), grants Tulsa jurisdiction over municipal violations committed by all

Tulsa's inhabitants, including Indians, in Indian country. Tulsa issued a traffic

citation to Mr. Hooper, an Indian and member of the Choctaw Nation, and he paid a

$150 fine for the ticket in Tulsa's Municipal Criminal Court ("municipal court").

2

Following the Supreme Court's decision in *McGirt v. Oklahoma*,[1] recognizing that the Muscogee (Creek) Reservation had never been disestablished, Mr. Hooper filed an application for post-conviction relief, arguing the municipal court lacked jurisdiction over his offense because it was a crime committed by an Indian in Indian country. Tulsa countered that it had jurisdiction over municipal violations committed by its Indian inhabitants stemming from Section 14 of the Curtis Act ("Section 14"), an 1898 statute granting lawmaking authority and jurisdiction to municipalities in the Indian Territory that existed prior to the formation of the state of Oklahoma. The municipal court agreed with Tulsa and denied Mr. Hooper's application.

Mr. Hooper then sought relief in federal court—filing a complaint (1) appealing the denial of his application for post-conviction relief and (2) seeking a declaratory judgment that Section 14 is inapplicable to Tulsa today. Tulsa filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, again arguing Tulsa could exercise jurisdiction over municipal violations by its Indian inhabitants based on a jurisdictional grant in Section 14 of the Curtis Act. The district court granted the motion to dismiss Mr. Hooper's declaratory judgment claim, agreeing with Tulsa that Congress granted the city jurisdiction over municipal violations by all its inhabitants, including Indians, through Section 14. Based on this determination, the district court dismissed Mr. Hooper's appeal of the municipal court's denial of his petition for post-conviction relief as moot.

---

[1] 140 S. Ct. 2452 (2020).

3

On appeal, Mr. Hooper argues the district court erred by granting Tulsa's Rule 12(b)(6) motion to dismiss his declaratory judgment claim because Section 14 of the Curtis Act no longer grants power to Tulsa. Mr. Hooper contends the district court also erred in dismissing his appeal of the denial of his petition for post-conviction relief as moot based on the same analysis. Tulsa counters that Section 14 has never been repealed and still grants Tulsa jurisdiction over municipal violations committed by all its inhabitants.[2] Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude the district court erred in granting dismissal of Mr. Hooper's declaratory judgment claim because even if the Curtis Act was never repealed, it is no longer applicable to Tulsa. We also agree with Mr. Hooper that the district court erred in dismissing his appeal from the municipal court as moot based on its analysis of Section 14, but we determine the district court lacked jurisdiction over Mr. Hooper's appeal from the municipal court. We therefore reverse the district court's grant of Tulsa's Rule 12(b)(6) motion to dismiss Mr. Hooper's declaratory judgment claim,

---

[2] Several amici curiae submitted briefs. In support of Mr. Hooper, the Muscogee (Creek) Nation ("the Creek Nation") and a group of tribes consisting of the Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, Quapaw Nation, and Seminole Nation of Oklahoma ("the Nations"), submitted briefs arguing Tulsa lacks jurisdiction over municipal violations by Indians in Indian country. In support of Tulsa, the state of Oklahoma and the Oklahoma Association of Municipal Attorneys ("OAMA") submitted briefs arguing for affirmance of the district court's decision. We accepted those briefs and also allowed the Creek Nation and OAMA to participate in oral argument. "[T]o the extent that amici's contentions illuminate the contours of the parties' respective positions or explicate the real-world . . . implications of the legal issues before us we consider them." *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1226 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022) (internal quotation marks omitted).

4

vacate the district court's dismissal of Mr. Hooper's appeal as moot, direct the district court to dismiss Mr. Hooper's appeal without prejudice for lack of jurisdiction, and remand for proceedings consistent with this opinion.

## I.     BACKGROUND

### A.     *Factual Background*[3]

On August 13, 2018, Mr. Hooper received a speeding ticket in the city of Tulsa, Oklahoma. Specifically, Mr. Hooper was cited for driving over the speed limit in violation of City of Tulsa Revised Ordinances Title 37 Section 617A. The location of Mr. Hooper's citation for speeding was within the Muscogee (Creek) Reservation's boundaries. The municipal court found Mr. Hooper guilty of the moving violation, and Mr. Hooper was ordered to pay a citation fee of $150. Mr. Hooper is a resident of Tulsa and a member of the Choctaw Nation, a federally recognized Indian tribe.

### B.     *Procedural Background*

Around five months after the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), Mr. Hooper filed an application for post-conviction relief with the municipal court.[4] Mr. Hooper claimed, based on the Supreme Court's holding in *McGirt*, that the Muscogee (Creek) Reservation had not been disestablished, *see McGirt*, 140 S. Ct. at 2482, Tulsa lacked jurisdiction to

---

[3] All facts are drawn from Mr. Hooper's complaint.

[4] Mr. Hooper subsequently amended the application twice to bring it into compliance with Oklahoma's Post-Conviction Relief Act.

5

prosecute him, an Indian in Indian country, for violation of a municipal ordinance. Tulsa responded by arguing (1) Mr. Hooper's application for post-conviction relief contained fatal procedural defects and (2) the municipal court properly exercised jurisdiction over Mr. Hooper based on jurisdiction granted by Congress under Section 14 to municipalities, including Tulsa, in what was known as the "Indian Territory" prior to Oklahoma receiving statehood.

The municipal court denied Mr. Hooper's application for post-conviction relief. The court rejected Tulsa's first argument, determining Mr. Hooper's application, as amended, complied with the requirements of the Oklahoma Post-Conviction Relief Act. But the court agreed with Tulsa that it had properly exercised jurisdiction over Mr. Hooper's moving violation based on jurisdiction stemming from Section 14. Specifically, the municipal court relied on Section 14's statement that "all inhabitants of such cities and towns, without regard to race, shall be subject to all laws and ordinances of such city or town governments, and shall have equal rights, privileges, and protection therein." App. at 26 (quoting Curtis Act, § 14, 30 Stat. 495, 499–500 (1898)). The municipal court concluded that "pursuant to the Curtis Act, the City of Tulsa has had subject matter jurisdiction to hear violations of its ordinances [by its Indian inhabitants] since 1898." *Id.* at 27. The municipal court further determined the relevant section of the Curtis Act had not been repealed and that Congress may at times grant powers to municipalities that are not available to states. Accordingly, the municipal court denied Mr. Hooper's application for post-conviction relief. The municipal court noted that the state of Oklahoma lacked

jurisdiction over any potential appeal, but Mr. Hooper could appeal its judgment to the federal district court.

Mr. Hooper responded to the municipal court's decision by filing a complaint with the United States District Court for the District of Northern Oklahoma. In the complaint, Mr. Hooper brings two counts: (1) he appeals the municipal court's dismissal of his application for post-conviction relief; and (2) he seeks a declaratory judgment "that the Curtis Act is inapplicable to present times and confers no jurisdiction to municipalities to prosecute and punish Indians for offenses that occur on an Indian Reservation." *Id.* at 105. Mr. Hooper explains that he filed his appeal with the federal district court, rather than the Oklahoma Criminal Court of Appeals, because Oklahoma state courts lack jurisdiction over the matter, which relates to criminal conduct by an Indian in Indian country, and the appeal presents a federal question. Mr. Hooper also posits that if the municipal court is correct that Tulsa properly exercised jurisdiction over his municipal violation pursuant to Section 14, appeals from the decisions of municipalities under Section 14 were historically heard by the federal district courts.

Tulsa responded to Mr. Hooper's complaint with a Rule 12(b)(6) motion to dismiss, arguing Tulsa properly exercised jurisdiction over Mr. Hooper's municipal violation based on the jurisdiction granted by Section 14. Tulsa argued (1) the city of Tulsa was incorporated pursuant to the Curtis Act, (2) Section 14 granted municipalities jurisdiction over municipal violations by all their inhabitants, Indian and non-Indian alike, and (3) Congress never repealed Section 14. Accordingly,

7

Tulsa argued that Mr. Hooper's appeal and claim for declaratory judgment both failed as a matter of law. Mr. Hooper countered that (1) a Rule 12(b)(6) summary dismissal was not appropriate in the context of a criminal appeal; (2) the Curtis Act no longer granted authority to Tulsa following statehood or had been repealed; (3) even if it still granted authority to Tulsa, the Curtis Act did not grant municipal courts jurisdiction over cases against Indians; and (4) Tulsa could not exercise jurisdiction over Indians which Oklahoma lacks when Tulsa, as a political subdivision of the state, derives all its authority from the state.

The district court issued an order seeking supplemental briefing from both parties addressing whether *McGirt* "ha[d] retroactive effect to permit post-conviction relief in this case" and "the propriety of [the district court] ruling on a civil motion to dismiss in [an] appeal of the municipal criminal court's denial of post-conviction relief." *Id.* at 226. Addressing the court's first question, Tulsa contended *McGirt* had no retroactive effect on applications for post-conviction relief, because it announced a rule of criminal procedure, which could not be applied retroactively to collaterally attack a conviction based on the Supreme Court's holding in *Teague v. Lane*, 489 U.S. 288, 310 (1989). Mr. Hooper countered that *McGirt* did not announce a procedural change to criminal procedure but established that Oklahoma had lacked jurisdiction to convict Indians of crimes committed in Indian country, and that lack of subject matter jurisdiction could never be waived. Turning to the court's second question, Tulsa posited the district court could grant Tulsa's Rule 12(b)(6) motion to dismiss Mr. Hooper's appeal of the denial of post-conviction relief because

8

Mr. Hooper chose to bring the appeal through a civil action. Alternatively, Tulsa suggested Mr. Hooper's appeal may be rendered moot if the district court granted dismissal of Mr. Hooper's declaratory judgment claim. Mr. Hooper argued Tulsa's Rule 12(b)(6) motion was not the appropriate vehicle for resolving his criminal appeal and that only Mr. Hooper's declaratory judgment claim was subject to dismissal under Tulsa's motion.

The district court granted Tulsa's Rule 12(b)(6) motion to dismiss Mr. Hooper's claim seeking declaratory judgment and determined his appeal from the municipal court's denial of his application for post-conviction relief was accordingly moot. First, the district court addressed the unique posture of the case—Mr. Hooper brought a civil claim, seeking declaratory judgment, and a criminal appeal, appealing the denial of his application for post-conviction relief. The court determined the Rule 12(b)(6) motion applied to the civil claim, and if dismissal of the civil claim was appropriate, the criminal appeal would be rendered moot. The district court concluded *McGirt* had no impact on the ability of Tulsa to exercise jurisdiction over Indians because the decision did not address the jurisdictional grant in the Curtis Act. The court determined Section 14 granted Tulsa the ability to exercise jurisdiction over municipal violations committed by all its inhabitants, including Indians, and that Section 14 was never repealed. Relying on *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958), the district court further concluded that Congress could grant municipalities powers different than those granted to the state. Having determined Tulsa properly exercised jurisdiction over Mr. Hooper's traffic violation, the court

9

granted Tulsa's Rule 12(b)(6) motion to dismiss Mr. Hooper's claim for declaratory judgment and determined Mr. Hooper's appeal of his application for post-conviction relief was moot.

Mr. Hooper timely filed notice of appeal.

## II.    DISCUSSION

Mr. Hooper argues the district court erred in granting Tulsa's Rule 12(b)(6) motion to dismiss his declaratory judgment claim, and accordingly erred in determining his appeal of the denial of his application for post-conviction relief was moot, because the jurisdictional grant in Section 14 has not applied to Tulsa since the city became a political subdivision of the state of Oklahoma. Tulsa counters that it may still exercise jurisdiction over municipal violations committed by its Indian inhabitants because Congress never repealed Section 14 and Section 14's jurisdictional grant continues to apply to municipalities that were formerly organized according to the Curtis Act in the Indian Territory.[5] After assuring ourselves we have

---

[5] Amicus Oklahoma raises an alternative ground for affirming the district court, citing the Supreme Court's recent decision in *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486 (2022), to argue Oklahoma has inherent jurisdiction over Indians within its boundaries and has "conferred that jurisdiction on Tulsa here." Amicus Oklahoma's Br. at 5. Our court system "is a party-directed adversarial system and we normally limit ourselves to the arguments the parties before us choose to present." *United States v. Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016). Although we "ha[ve] the discretion to reach arguments raised only in an *amicus curiae* brief," we "exercise that discretion only in exceptional circumstances" such as when "(1) a party attempts to raise the issue by reference to the *amicus* brief; or (2) the issue 'involves a jurisdictional question or touches upon an issue of federalism or comity that could be considered sua sponte.'" *Tyler v. City of Manhattan*, 118 F.3d 1400, 1404 (10th Cir. 1997) (quoting *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993)). We do not exercise our discretion to reach the argument raised only by amicus

jurisdiction over Mr. Hooper's appeal of the district court's dismissal of his declaratory judgment claim, we set the stage for the parties' dispute by reviewing the history of federal governance in the territories that preceded Oklahoma, the enactment of the Curtis Act, and Oklahoma's transition to statehood. We then turn to the parties' arguments. After addressing the merits of Mr. Hooper's declaratory judgment claim, we address Mr. Hooper's secondary argument that the district court erred by dismissing his appeal from the municipal court as moot.

### A.     Declaratory Judgment Claim

### 1.     Jurisdiction

Prior to reaching the merits of Mr. Hooper's appeal of the district court's grant of Tulsa's Rule 12(b)(6) motion to dismiss his declaratory judgment claim, we address our "independent duty to assure ourselves of the district court's subject-matter jurisdiction." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1211 (10th Cir. 2018). Considering this duty, we sought supplemental briefing from Mr. Hooper and Tulsa addressing "whether Mr. Hooper has met his burden to demonstrate he has standing to bring his declaratory judgment claim." Order at 1,

---

Oklahoma because Tulsa did not "attempt[] to raise the issue by reference to the amicus brief" either in its briefing or at oral argument, the issue does not involve a question of this court's jurisdiction, federalism, or comity that the panel could address sua sponte, and Oklahoma does not argue exceptional circumstances warrant consideration of its argument. *Id.*; *see also Ackerman*, 831 F.3d at 1292 ("[T]his court has routinely declined to consider arguments presented only in an amicus brief—and no one even attempts to offer us a reason to depart from that practice here."). Accordingly, we leave resolution of this issue for a case where it is properly raised by the parties.

*Hooper v. City of Tulsa*, No. 22-5034 (10th Cir. Apr. 20, 2023). After reviewing the supplemental briefs, we agree with both parties that Mr. Hooper has satisfied this burden.

The district court exercised jurisdiction over Mr. Hooper's declaratory judgment claim pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and federal question jurisdiction, 28 U.S.C. § 1331. Like all plaintiffs seeking judicial review in the federal courts, an individual bringing a claim under the Declaratory Judgment Act has the burden of meeting Article III of the Constitution's justiciability requirements. *See* U.S. Const. art. III, § 2; *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." (quoting 28 U.S.C. § 2201(a))). The Supreme Court has held that a plaintiff bringing a declaratory judgment claim meets this burden if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). To meet his standing burden, Mr. Hooper needed to "show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent;

12

(ii) that the injury was likely caused by [Tulsa]; and (iii) that the injury would likely

be redressed by judicial relief." *Id.* Because Mr. Hooper's declaratory judgment

claim seeks prospective relief, "he must demonstrate a continuing injury." *Jordan v.*

*Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011). "At the pleading stage, general factual

allegations of injury resulting from the defendant's conduct may suffice, for on a

motion to dismiss we 'presum[e] that general allegations embrace those specific facts

that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Although Mr. Hooper's complaint includes only minimal allegations relating

to injury, we determine he satisfied his standing burden at the pleading stage. *See*

*Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1330 (10th Cir. 2022)

(determining plaintiff met its burden to demonstrate standing at pleading stage even

where "complaint [wa]s somewhat vague about its purported injury"). Mr. Hooper

alleges in his complaint that he is an Indian living in Tulsa and that Tulsa is

wrongfully exercising jurisdiction over him pursuant to its erroneous interpretation of

Section 14. Specifically, Mr. Hooper points to (1) Tulsa's past exercise of

jurisdiction over him through the issuance of a traffic ticket and (2) the municipal

court's determination that Tulsa, pursuant to Section 14, can exercise jurisdiction

over municipal violations committed by Indians. Mr. Hooper alleges a declaratory

judgment in his favor is necessary to prevent Tulsa from continuing to wrongfully

exercise jurisdiction over him pursuant to Section 14. We presume Mr. Hooper's

general allegations embrace the fact that Mr. Hooper reasonably fears Tulsa will

continue to wrongfully exercise jurisdiction over him, an Indian living in the Creek Reservation. *See Lujan*, 504 U.S. at 561. This is sufficient to demonstrate Mr. Hooper faces an imminent injury—infringement on his right as an Indian living on a reservation to be free from the city's exercise of jurisdiction.

In *McClanahan v. State Tax Commission of Arizona*, the Supreme Court recognized that although Congress "has, most often, dealt with the tribes as collective entities," "those entities are . . . composed of individual Indians, and the legislation confers individual rights." 411 U.S. 164, 181 (1973). Specifically, the Court recognized that individual Indians living on reservations have the right "to make their own laws and be ruled by them." *Id.* at 181 (quoting *Williams v. Lee*, 358 U.S. 217, 220 (1959)). Mr. Hooper's allegations in his complaint adequately demonstrate he faces the continuous injury of Tulsa's infringement on his right as an Indian living on a reservation to be self-governing. Further, this alleged injury is caused by Tulsa and would be redressed by a favorable decision from the district court. *See TransUnion LLC*, 141 S. Ct. at 2203. Accordingly, we agree with the district court that "there is a substantial, real, and immediate controversy between the adverse parties here," App. at 12, so the district court properly exercised jurisdiction over Mr. Hooper's declaratory judgment claim.

The district court also properly exercised jurisdiction pursuant to 28 U.S.C. § 1331 because Mr. Hooper alleges in his complaint that he seeks a declaratory judgment to establish the proper interpretation of Section 14 of the Curtis Act, a federal statute. The district court issued a final judgment, granting Tulsa's Rule

14

12(b)(6) motion to dismiss Mr. Hooper's claim for declaratory judgment and dismissing Mr. Hooper's appeal of his petition for post-conviction relief as moot— "disposing of [Mr. Hooper's] case on the merits." App. at 260. Accordingly, we exercise jurisdiction over Mr. Hooper's appeal pursuant to 28 U.S.C. § 1291. *See* 28 U.S.C. § 1291 (granting courts of appeals jurisdiction over "appeals from all final decisions of the district courts of the United States"); *see also Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps.*, 571 U.S. 177, 183 (2014) ("In the ordinary course a 'final decision' is one that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." (quoting *Catlin v. United States*, 324 U.S. 299, 233 (1945))).

**2.    History of the Curtis Act and Tulsa**

*a.    The Indian and Oklahoma Territories*

Congress first addressed the governance of individuals living in the area that would eventually make up the state of Oklahoma through the Oklahoma Organic Act, 26 Stat. 81 (1890).[6] The Oklahoma Organic Act recognized "two territories: the Oklahoma Territory in the west and Indian Territory in the east. Originally . . . criminal prosecutions in the Indian Territory were split between tribal and federal courts." *McGirt*, 140 S. Ct. at 2476; *see also Murphy v. Royal*, 875 F.3d 896, 934–35 (10th Cir. 2017) (noting that through the Oklahoma Organic Act, "Congress carved

---

[6] Now commonly referred to as the Oklahoma Organic Act, the act was originally titled "An act to provide a temporary government for the Territory of Oklahoma, to enlarge the jurisdiction of the United States Court in the Indian Territory, and for other purposes." 26 Stat. 81 (1890).

the Territory of Oklahoma out of the western half of the Indian Territory" while

"[t]he lands in the east held by the Five Civilized Tribes remained Indian Territory,

subject only to federal and tribal authority" (quotation marks omitted)). The

Oklahoma Organic Act adopted two separate sets of law for the Oklahoma Territory

and the Indian Territory. 26 Stat. 81, 87, 94–95 (1890). First, selected "chapters and

provisions of the Compiled Laws of the State of Nebraska . . . [we]re [] extended to

and put in force in the Territory of Oklahoma until after the adjournment of the first

session of the legislative assembly of said Territory." 26 Stat. 81, 87 (1890). The act

provided for the Oklahoma Territory to have a governor, who would exercise

executive authority, and a legislative assembly, that would create laws for the

territory. 26 Stat. 81, 82–83 (1890). The act further provided "[t]hat the judicial

power of said Territory shall be vested in a supreme court, district courts, probate

courts, and justices of the peace." 26 Stat. 81, 85 (1890).

> Second, in the Indian Territory, the Oklahoma Organic Act provided

> [t]hat certain general laws of the State of Arkansas . . . in the volume
> known as Mansfield's Digest of the Statutes of Arkansas, which [we]re
> not locally inapplicable or in conflict with [the Oklahoma Organic] [A]ct
> or with any law of Congress, relating to the subjects specially mentioned
> in this section, [we]re hereby extended over and put in force in the Indian
> Territory until Congress shall otherwise provide.

26 Stat. 81, 94–95 (1890). *See, e.g.*, *Adkins v. Arnold*, 235 U.S. 417, 420 (1914)

("The act of May 2, 1890 (26 Stat. at L. 81, chap. 182), § 31, put in force, until

Congress should otherwise provide, several general laws of Arkansas appearing in

Mansfield's Digest of 1884."); *Okla. City v. McMaster*, 196 U.S. 529, 531 (1905)

16

(noting the Oklahoma Organic Act "provid[ed] a territorial government for Oklahoma").

In this same period, "Congress sought to pressure many tribes to abandon their communal lifestyles and parcel their lands into smaller lots owned by individual tribe members." *McGirt*, 140 S. Ct. at 2463. This period, which began in the 1880s, is known as the "allotment era." *Id.* "In 1893, Congress charged the Dawes Commission with negotiating changes to the Creek Reservation. Congress identified two goals: Either persuade the Creek to cede territory to the United States, as it had before, or agree to allot its lands to Tribe members." *Id.* When the Five Civilized Tribes[7] refused to negotiate with the Dawes Commission, Congress "began to force the issue by placing restrictions on the Indian governments and expanding federal jurisdiction within Indian Territory." *Indian Country, U.S.A., Inc. v. Okla. ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 977 (10th Cir. 1987). In 1897, placing pressure on the Five Civilized Tribes to agree to allotment, Congress "(1) provid[ed] that the body of federal law in Indian Territory, which included the incorporated Arkansas laws, was to apply irrespective of race; (2) broadened federal court jurisdiction, thereby divesting Creek tribal courts of exclusive jurisdiction over cases involving only Creeks; and (3) subjected Creek legislation to presidential veto." *Murphy*, 875 F.3d at 934 (internal quotation marks omitted).

---

[7] "The Cherokees, Chickasaws, Choctaws, Creeks, and Seminoles historically have been referred to as the 'Five Civilized Tribes.'" *Indian Country, U.S.A., Inc. v. Okla. ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 970 n.2 (10th Cir. 1987).

Against this backdrop, the city of Tulsa, located in the Indian Territory,

incorporated "under the laws of the state of Arkansas" in January 1898, as permitted

by the Oklahoma Organic Act.[8] At the time, the Oklahoma Organic Act allowed for

municipalities in the Indian Territory to operate according to "chapter twenty-nine,

division one" of the Mansfield's Digest of the Statutes of Arkansas ("Mansfield's

Digest"). *See* Oklahoma Organic Act, 26 Stat. 81, 94–95 (1890). "[C]itizens of the

United States and residents of the town of Tulsa, Indian Territory" submitted a

petition on December 16, 1897, "for an order of municipal corporation of the said

town of Tulsa into a body politic under the name of Tulsa under the laws of the State

of Arkansas." App. at 38. The United States District Court for the Northern District

of the Indian Territory approved the petition on January 18, 1898.

A few months after Tulsa incorporated, Congress passed the Curtis Act. *See* 30

Stat. 495 (1898). The Curtis Act "continued the campaign for allotment by

'abolish[ing] the existing Creek court system and render[ing] then-existing tribal

laws unenforceable in the federal courts'" and "'provided for forced allotment and

termination of tribal land ownership without tribal consent unless the tribe agreed to

---

[8] Tulsa objects to Mr. Hooper's inclusion of historical public records in his appendix, arguing this court should not consider these texts, as Mr. Hooper did not present them before the district court. When reviewing a district court's grant of a motion to dismiss, we may consider sources of which we can take judicial notice, including public records. *See Warnick v. Cooley*, 895 F.3d 746, 754 n.6 (10th Cir. 2018). Further, by providing the court with Tulsa's petition for incorporation and original charter, Mr. Hooper is not raising a new issue on appeal, as the timing of Tulsa's incorporation was raised by Tulsa before the district court. Accordingly, we take judicial notice of Tulsa's petition for incorporation and original charter.

allotment.'" *Murphy*, 875 F.3d at 934 (alterations in original) (first quoting *Indian Country, U.S.A.*, 829 F.2d at 978 and then quoting *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1441 (D.C. Cir. 1988)). In addition to abolishing tribal courts and forcing allotment of tribal land, Section 14 of the Curtis Act provided a path for municipalities in the Indian Territory to incorporate, hold elections, levy taxes, operate schools, and pass and enforce ordinances based on Arkansas law. Curtis Act, § 14, 30 Stat. 495, 499–500 (1898). Section 14 allowed municipalities to incorporate according to chapter twenty-nine of Mansfield's Digest and provided that all inhabitants of appropriately organized municipalities would be eligible to vote and subject to the municipalities' laws. *Id.*

Following the 1898 enactment of the Curtis Act, "[i]n 1901, the Creek Nation finally agreed to the allotment of tribal lands." *Indian Country, U.S.A.*, 829 F.2d at 978. In 1901, Congress enacted the Creek Allotment Act, and the following year, Congress enacted the 1902 Cherokee Allotment Act. *See* Creek Allotment Act, 31 Stat. 861 (1901); Cherokee Allotment Act, 32 Stat. 716 (1902). These acts both provided that "no Act of Congress or treaty provision inconsistent with this agreement shall be in force in said nation, except section fourteen of [the Curtis Act], which shall continue in force as if this agreement had not been made." Creek Allotment Act, 31 Stat. 861, 872 (1901); *see also* Cherokee Allotment Act, 32 Stat. 716, 727 (1902). In 1906, Congress enacted the Five Civilized Tribes Act. *See* 34 Stat. 137 (1906). The Five Civilized Tribes Act "cut[] away further at the Tribe's autonomy . . . . [by] empower[ing] the President to remove and replace the principal

19

chief of the Creek, prohibit[ing] the tribal council from meeting more than 30 days a year, and direct[ing] the Secretary of the Interior to assume control of tribal schools." *McGirt*, 140 S. Ct. at 2466 (citing Five Civilized Tribes Act, 34 Stat. 137, 139–40, 148 (1906)).

b.     *Oklahoma enters the Union and Tulsa reorganizes under Oklahoma law*

"Two months after enacting the Five [Civilized] Tribes Act, Congress passed an enabling act to permit the people of the Oklahoma and Indian territories to form a state." *Indian Country, U.S.A.*, 829 F.2d at 978. The Oklahoma Enabling Act allowed "the inhabitants of all that part of the area of the United States now constituting the Territory of Oklahoma and the Indian Territory, as at present described, [to] adopt a constitution and become the State of Oklahoma." 34 Stat. 267, 267 (1906). The Oklahoma Enabling Act provided for the laws of the former Oklahoma Territory to apply across the entire state, including the former Indian Territory, stating "the laws in force in the Territory of Oklahoma, as far as applicable, shall extend over and apply to said State until changed by the legislature thereof." 34 Stat. 267, 275 (1906). The Enabling Act further stated,

> [A]ll laws in force in the Territory of Oklahoma at the time of the admission of said State into the Union shall be in force throughout said State, except as modified or changed by this Act or by the constitution of the State, and the laws of the United States not locally inapplicable shall have the same force and effect within said State as elsewhere with the United States.

34 Stat. 267, 277–78 (1906).

20

The following year, Oklahoma adopted its Constitution, becoming the forty-sixth state in the Union. *See* Okla. Const. The Oklahoma Constitution provided for the organization of municipalities, stating, "Municipal corporations shall not be created by special laws, but the Legislature, by general laws shall provide for the incorporation and organization of cities and towns and the classification of same in proportion to population, subject to the provisions of this article." *Id.* art. XVIII, § 1. The constitution further stated, under a section titled "Existing municipal corporations continued--Rights and powers," that "[e]very municipal corporation now existing within this State shall continue with all of its present rights and powers until otherwise provided by law, and shall always have the additional rights and powers conferred by this Constitution." *Id.* art. XVIII, § 2. The Oklahoma Constitution also provided for cities to create charters under state law:

> Any city containing a population of more than two thousand inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and laws of this State . . . . Upon such approval it shall become the organic law of such city and supersede any existing charter and all amendments thereof and all ordinances inconsistent with it.

*Id.* art. XVIII, § 3(a). Tulsa enacted a charter according to Article 18 § 3 of the Oklahoma Constitution in 1908. *See* Charter of the City of Tulsa, Okla. (1908). According to that charter,

> The City of Tulsa shall have the power to enact and to enforce ordinances necessary to protect health, life and property . . . . and it shall have and exercise all powers of municipal government not prohibited to it by this Charter, or by some general law of the State of Oklahoma, or by the provisions of the Constitution of the State of Oklahoma.

*Id.* art. 2, § 2. Accordingly, Tulsa's 1908 Charter "supersed[ed]" Tulsa's previous charter under the Oklahoma Organic Act. *See* Okla. Const. art. XVIII, § 3(a).

**3.    Analysis**

Mr. Hooper argues the district court erred in granting Tulsa's motion to dismiss his declaratory judgment claim because Section 14 of the Curtis Act no longer applies to Tulsa. Specifically, Mr. Hooper argues Congress conditioned its grant of jurisdiction through Section 14 on municipalities being organized and authorized according to chapter twenty-nine of Mansfield's Digest. Because Tulsa is now organized as an Oklahoma charter city under Oklahoma law, Mr. Hooper contends Section 14 no longer confers jurisdiction on Tulsa. Tulsa counters that Section 14's references to Mansfield's Digest have been implicitly replaced with Oklahoma law and that Oklahoma's Constitution preserved its ability to exercise jurisdiction pursuant to Section 14 following statehood. Although Mr. Hooper does not argue on appeal that Section 14 was either implicitly or expressly repealed,[9] Tulsa dedicates much of its briefing to demonstrating Section 14 was never repealed and remains good law. After setting out the standard of review, we interpret the text of Section 14 and determine the scope of its jurisdictional grant. Then, we turn to whether Section 14's jurisdictional grant continued to apply to Tulsa after it reorganized as an Oklahoma charter city.

---

[9] At oral argument, Mr. Hooper clarified that "this is not a case of an implied repeal." Oral Argument, *Hooper v. City of Tulsa*, No. 22-5034, at 5:12–15 (10th Cir. Mar. 23, 2023).

a.    *Standard of review*

"We review a Rule 12(b)(6) dismissal de novo and apply the same standards as the district court." *Sagome, Inc. v. Cincinnati Ins. Co.*, 56 F.4th 931, 934 (10th Cir. 2023). "[A]ll well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) (quotation marks omitted). "A complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[D]ismissal under Rule 12(b)(6) is appropriate if the complaint alone is legally insufficient to state a claim." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104–05 (10th Cir. 2017). Here, the district court granted dismissal of Mr. Hooper's claim based on statutory interpretation. Like Rule 12(b)(6) dismissals, "[w]e also review questions of statutory interpretation de novo." *Solar v. City of Farmington*, 2 F.4th 1285, 1289 (10th Cir. 2021).

b.    *Scope of jurisdictional grant in Section 14 of the Curtis Act*

We "interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment" as "only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). Courts "may not 'replace the actual text with speculation as to Congress' intent.'" *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)); *see also Kan. Nat. Res.*

*Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020) ("The goal of statutory interpretation is to ascertain the congressional intent and give effect to the legislative will. In conducting this analysis, we first turn to the statute's plain language." (internal quotation marks omitted)). To interpret a statute's plain language, "[w]e give undefined terms their ordinary meanings, considering both the specific context in which the word is used and the broader context of the statute as a whole." *In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018) (internal quotation marks omitted). "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

With these principles in mind, we turn to the text of Section 14. Referring to cities and towns in the Indian Territory that have "incorporated as provided in chapter twenty-nine of Mansfield's Digest of the Statutes of Arkansas," Section 14 states, with our emphasis, that "such city or town government, *when so authorized and organized*, shall possess all the powers and exercise all the rights of similar municipalities in said State of Arkansas." Section 14 proceeds to state:

> All male inhabitants of such cities and towns over the age of twenty-one years, who are citizens of the United States or of either said tribes, who have resided therein more than six months next before any election held under this Act, shall be qualified voters at such election. That mayors of such cities and towns, in addition to their other powers, shall have the same jurisdiction in all civil and criminal cases arising within the corporate limits of such cities and towns as, and coextensive with, United

States commissioners in the Indian Territory, . . . . *and all inhabitants of such cities and towns, without regard to race, shall be subject to all laws and ordinances of such city or town governments, and shall have equal rights, privileges, and protection therein*. . . . .

For the purposes of this section all the laws of said State of Arkansas herein referred to, so far as applicable, are hereby put in force in said Territory; and the United States court therein shall have jurisdiction to enforce the same, and to punish any violation thereof, and the city or town councils shall pass such ordinances as may be necessary for the purpose of making the laws extended over them applicable to them and for carrying the same into effect.

30 Stat. 495, 499–500 (1898) (emphasis added).

Based on its plain text, Section 14 grants a limited set of municipalities jurisdiction over violations of municipal ordinances by all their inhabitants: municipalities in the Indian Territory that are organized and authorized according to chapter twenty-nine of Mansfield's Digest. This limitation on the grant of jurisdiction is repeated throughout Section 14. First, Section 14 opens by stating "[t]hat the inhabitants of any city or town in [the Indian Territory][10] . . . may proceed to have the [city or town] incorporated as provided in chapter twenty-nine of Mansfield's Digest of the Statutes of Arkansas, if not already incorporated thereunder." 30 Stat. 495, 499 (1898). Section 14 proceeds to state that "such city or town government, when so authorized and organized, shall possess all the powers and exercise all the rights of similar municipalities in said State of Arkansas." *Id.* Here, Section 14's requirement

---

[10] Section 14 refers to "said Territory," Curtis Act, § 14, 30 Stat. 495, 499 (1898), but the opening of the Curtis Act shows the act is directed towards the "Indian Territory," and later references throughout the Act to "said Territory" or "such Territory" are referring back to the Indian Territory. *See* Curtis Act, § 1, 30 Stat. 495, 495 (1898).

that a city or town government be "so authorized and organized" refers to the preceding requirement that the city or town be authorized and organized according to chapter twenty-nine of Mansfield's Digest. *Id.* Further, rather than stating "after being so authorized and organized," or "once so authorized and organized," Congress chose to limit the following grant of power—that municipalities would "possess all the powers and exercise all the rights of similar municipalities in said State of Arkansas"—to "when [municipalities were] so authorized and organized," conditioning this grant of power on municipalities being authorized and organized according to chapter twenty-nine of Mansfield's Digest.

All of Section 14's following grants of power, including the jurisdiction granting provisions at issue in this case, refer back to "such cities and towns." *See, e.g.*, *id.* ("That mayors of *such cities and towns*, in addition to their other powers, shall have the same jurisdiction in all civil and criminal cases arising within the corporate limits of *such cities and towns* as, and coextensive with, United States commissioners in the Indian Territory." (emphases added)); *see also id.* ("[A]nd all inhabitants of *such cities and towns*, without regard to race, shall be subject to all laws and ordinances of *such city or town governments*, and shall have equal rights, privileges, and protection therein." (emphases added)). Since prior to the enactment of the Curtis Act, "such" has been defined as "the same as previously mentioned or specified; not other or different." 7 Century Dictionary 6039 (William Dwight Whitney ed., 1889); *see also* 4 Universal Dictionary of the English Language 4525 (Robert Hunter & Charles Morris eds., 1897) (defining "such" as "[t]he same as

26

mentioned or specified; not another or different; so; in the same state or condition");
*c.f. Such*, Black's Law Dictionary (11th ed. 2019) ("That or those; having just been
mentioned"). Congress's choice to grant jurisdiction only to "such cities and towns"
limits Section 14's jurisdictional grant to the cities and towns previously described—
cities and towns in the Indian Territory organized and authorized according to
chapter twenty-nine of Mansfield's Digest and empowered to "possess all the powers
and exercise all the rights of similar municipalities in said State of Arkansas." 30
Stat. 495, 499 (1898).

Section 14's grant of lawmaking authority provides additional context to
Section 14's grant of jurisdiction. Under Section 14, municipalities are permitted to
"pass such ordinances as may be necessary for the purposes of making the laws
extended over them applicable to them and carrying the same into effect." 30 Stat.
495, 500 (1898). Immediately preceding this grant of power to pass ordinances,
Section 14 states that "[f]or the purposes of this section all the laws of said State of
Arkansas herein referred to, so far as applicable, are hereby put in force in [the
Indian] [T]erritory." *Id.* So, municipalities are permitted under Section 14 to "pass
such ordinances as may be necessary for the purposes of making ['the laws of said
State of Arkansas herein referred to'] applicable to them and carrying the same into
effect." *Id.* This limitation that ordinances align with Arkansas law is consistent with
Section 14 applying only to towns and cities organized according to chapter twenty-
nine of Mansfield's Digest, which is a digest of the laws of Arkansas. *See generally*
Mansfield's Digest of the Statutes of Arkansas (1884).

Mr. Hooper does not dispute that Section 14 provided Tulsa with jurisdiction over municipal violations committed by all its inhabitants, including Indians,[11] at the time it was enacted, as Tulsa was a municipality in the Indian Territory, authorized and organized according to chapter twenty-nine of Mansfield's Digest.[12] *See* Reply at 2. Rather, Mr. Hooper argues that once Tulsa reorganized under Oklahoma law, Section 14 no longer applied to the city. We agree.

      *c.     Section 14 of the Curtis Act no longer applies to Tulsa*

Having determined the scope of Section 14's grant of jurisdiction, we turn to the primary issue in this appeal—whether Section 14 still grants Tulsa jurisdiction over municipal violations committed by its Indian inhabitants today. As discussed above, Section 14 provides cities and towns in the Indian Territory organized and authorized according to chapter twenty-nine of Mansfield's Digest jurisdiction over municipal violations committed by their inhabitants. Because Tulsa is no longer such a city or town, Section 14 no longer grants jurisdiction to Tulsa. Tulsa argues Section

---

[11] Although Mr. Hooper argued before the district court that Section 14's reference to "all inhabitants" did not include Indians, he does not raise this argument on appeal. *See* Appellant's Br.; Reply. Mr. Hooper also does not argue that he is not an "inhabitant" of Tulsa. *See* Appellant's Br.; Reply.

[12] Amici the Nations argue that because Tulsa was incorporated according to the Oklahoma Organic Act of 1890, prior to the passage of the Curtis Act, Tulsa cannot exercise jurisdiction based on the Curtis Act. *See* Amici Nations' Br. at 15 ("Since it incorporated under the Organic Act, before the Curtis Act was passed, Tulsa cannot claim rights under the Curtis Act."). However, Mr. Hooper does not raise this issue or refer to the Nations' argument in his briefing. *See* Appellant's Br.; Reply. Because this issue was raised only by an amicus, and does not involve an issue we may reach sua sponte, such as our jurisdiction, federalism, or comity, we do not reach it. *Tyler*, 118 F.3d at 1404 (quoting *Swan*, 6 F.3d at 1383).

14 still grants it authority because (1) following Oklahoma's statehood the references to Arkansas law in Section 14 were replaced with references to Oklahoma law; (2) the Oklahoma Constitution reserved municipalities' preexisting rights and powers, including the jurisdiction granted by Section 14; and (3) Congress never repealed Section 14. We start by explaining why Section 14 no longer applies to Tulsa based on its plain text and then address why Tulsa's three arguments to the contrary are unavailing.

Following statehood, in 1908, Tulsa adopted a new charter reincorporating under Oklahoma law. Charter of the City of Tulsa, Oklahoma (1908). This new charter "supersed[ed]" Tulsa's previous charter under the Oklahoma Organic Act, and Tulsa ceased to be organized and authorized according to chapter twenty-nine of Mansfield's Digest. *See* Okla. Const. art. XVIII, § 3(a) (stating that following approval of a new charter, the new charter will "become the organic law of such city and supersede any existing charter and all amendments thereof and all ordinances inconsistent with it"). To this day, Tulsa continues to be a political subdivision of the state of Oklahoma, organized and authorized according to Oklahoma law. *See* City of Tulsa Amended Charter (1989). Because Tulsa is no longer authorized and organized according to chapter twenty-nine of Mansfield's Digest, Tulsa is no longer entitled to Congress's limited grant of jurisdiction in Section 14. Tulsa does not dispute that it is no longer authorized and organized according to chapter twenty-nine of Mansfield's Digest, but offers several theories as to why this change does not prevent it from exercising jurisdiction pursuant to Section 14.

29

First, Tulsa argues that the references in Section 14 to Arkansas law are immaterial because "[u]pon Oklahoma's statehood in 1907 together with Congressional approval of Oklahoma's Enabling Act, 34 Stat. 267 (1906), the references [in Section 14 of the Curtis Act] to Arkansas law were replaced by references instead to the law of the new State of Oklahoma." Appellee's Br. at 13. But Tulsa cites no portion of the Oklahoma Enabling Act or other act of Congress making such a change. The Oklahoma Enabling Act provided Oklahoma Territory law would extend across the entire state of Oklahoma, including the former Indian Territory, but did not address retention or amendment of Section 14 of the Curtis Act. *See* Oklahoma Enabling Act, § 13, 34 Stat. 267, 275 (1906). Congress's silence is not fairly interpreted as a directive to amend Section 14 of the Curtis Act to remove the conditions Congress expressly placed on municipalities' rights and powers in the former Indian Territory.

Amicus Oklahoma attempts to complete Tulsa's argument. Oklahoma contends that by extending Oklahoma Territory law over the former Indian Territory through the Oklahoma Enabling Act, Congress abrogated the application of Arkansas law but did not abrogate its grant of jurisdiction to municipalities over municipal violations committed by all their inhabitants, including Indians. Oklahoma argues that while there was a conflict between the application of Oklahoma Territory law and Arkansas law, there was no conflict between the Oklahoma Territory law and municipalities' exercise of jurisdiction, so the parts of Section 14 not involving Arkansas law remained in effect following the Oklahoma Enabling Act. Oklahoma's argument falls

30

short because it does not address the express requirement that the rights and powers granted in Section 14 are available only to a municipality organized and authorized according to Mansfield's Digest. Section 14 does not simply direct municipalities to apply Arkansas law in some places and grant them jurisdiction over municipal violations in others. The references to Arkansas law are intertwined with the powers Section 14 grants. Indeed, it expressly provides that the powers of municipalities are granted upon incorporation according to chapter twenty-nine of Mansfield's Digest, and continue when municipalities are "so authorized and organized." *See* 30 Stat. 495, 499–500 (1898).[13] Reading Section 14 the way Tulsa and Oklahoma suggest would require this court to ignore the express limitations Congress placed on the jurisdictional grant.

Tulsa also argues the jurisdictional grant in Section 14 still applied to Tulsa following Oklahoma's entry to the Union because Oklahoma reserved for its municipalities their current rights and powers at the time of its adoption through Article 18 § 2 of the Oklahoma Constitution. Article 18 § 2 of the Oklahoma Constitution states, "Every municipal corporation now existing within this State shall

---

[13] This limitation makes sense considering Section 14's historical context. Referring to an act of Congress putting the corporation laws of Arkansas in effect in the Indian Territory, the Supreme Court noted that this was but one of "a series of acts of that character" where "[Congress's] action was intended to be merely provisional" because Congress "was then contemplating the early inclusion of that territory in a new state, and the purpose of those acts was to provide, for the time being, a body of laws adapted to the needs of the locality and its people in respect of matters of local or domestic concern." *Shulthis v. McDougal*, 225 U.S. 561, 571 (1912).

continue with all of its *present rights and powers* until otherwise provided by law, and shall always have the additional rights and powers conferred by this Constitution." (Emphasis added.) Tulsa argues that based on Article 18 § 2, Oklahoma provided for Tulsa to retain its jurisdictional grant from the Curtis Act following statehood. This argument has two fatal shortcomings. First, the Oklahoma Constitution cannot amend an act of Congress. Congress limited its grant of jurisdiction in Section 14 to cities and towns in the Indian Territory organized and authorized according to chapter twenty-nine of Mansfield's Digest. Only Congress had the power to change that limitation. Second, upon statehood, even prior to Tulsa's adoption of a new charter under Oklahoma law, Tulsa ceased to be a municipality organized according to chapter twenty-nine of Mansfield's Digest. The Oklahoma Enabling Act extended Oklahoma Territory laws across the former Indian Territory. *See* Oklahoma Enabling Act, § 13, 34 Stat. 267, 275 (1906) (extending laws in force in Oklahoma Territory across former Indian Territory). This means, upon statehood, Tulsa became a municipality subject to the laws of the Oklahoma Territory, until the point it was reorganized under Oklahoma state law. So, by its express terms, Section 14 of the Curtis Act no longer applied to Tulsa upon statehood, and Tulsa had no "present rights and powers" stemming from the Curtis Act to be preserved by the Oklahoma Constitution. *See State ex rel. West v. Ledbetter*, 97 P. 834, 835 (Okla. 1908) ("Upon the admission of the state into the Union, the form of government theretofore existing in the Indian Territory ceased to

32

exist, and the laws in force in that territory under which Muskogee held its charter and exercised its municipal powers became inoperative.").

Tulsa dedicates much of its remaining briefing to demonstrating Section 14 of the Curtis Act has never been repealed. But with its focus on repeal, Tulsa is arguing past Mr. Hooper. Mr. Hooper does not argue Congress has either implicitly or expressly repealed Section 14.[14] *See* Oral Argument, *Hooper v. City of Tulsa*, No. 22-5034, at 5:12–15 (10th Cir. Mar. 23, 2023). Instead, he argues, based on its plain text, Section 14's jurisdictional grant no longer applies to Tulsa. Tulsa notes that "[s]ince its passage before Oklahoma statehood and to this day, there have been no changes to Section 14 of the Curtis Act." Appellee's Br. at 16 (emphasis omitted). Tulsa further contends that only Congress can repeal or amend a federal grant of jurisdiction. Although Tulsa cites these principles in support of its argument that the jurisdictional grant from Section 14 survived statehood, Tulsa fails to appreciate that because Congress has not amended or repealed Section 14, the plain text of Section 14, including its limitations on the grant of jurisdiction, also still applies. Based on this text, Section 14 does not confer jurisdiction upon Tulsa in its current form.

---

[14] Amicus OAMA filed a Federal Rule of Appellate Procedure Rule 28(j) letter bringing this court's attention to the District Court for the Northern District of Oklahoma's recent decision in *Pickup v. District Court of Nowata County*, where the district court concluded "that Congress has not implicitly repealed Curtis Act § 14." No. CIV 20-0346 JB/JFJ, 2023 WL 1394896, at *83 (N.D. Okla. Jan. 31, 2023). The district court's analysis in *Pickup* is not persuasive here because the district court in *Pickup* analyzed whether Congress repealed Section 14 but did not address the issue raised by Mr. Hooper: the conditions Congress placed on Section 14's grants of power. *See id.* at *83–86.

33

Tulsa warns that reversing the district court's decision would lead to an "unworkable" and "counterintuitive" "system where municipal laws would apply only to some inhabitants, but not others, depending on a complex algorithm with variables based on tribal membership of a defendant as well as discrete geographies within the City limits." Appellee's Br. at 29–30; *see also* Amicus OAMA's Br. at 3 (contending determination that Section 14 does not grant municipalities jurisdiction over municipal violations committed by Indians "will create unnecessary judicial inefficiency issues for all courts, even tribal courts, and will likely lead to the regular dismissal of local offenses"). Amicus Creek Nation counters that "[t]he Nation presently exercises highly effective criminal law enforcement throughout its Reservation—including in traffic matters—in close cooperation with other governments" and "[r]eversing the district court's decision will allow that cooperative enforcement to continue to flourish." Amicus Creek Nation's Br. at 23. Both Tulsa and Mr. Hooper speculate about possible unintended consequences of either affirming or reversing the district court, but ultimately, we are limited to interpreting the law Congress enacted and not the parties' "dire warnings." *See McGirt*, 140 S. Ct. at 2481 ("[D]ire warnings are just that, and not a license for us to disregard the law."). In *McGirt*, the Supreme Court explained that courts need not "consult extratextual sources when the meaning of a statute's terms is clear," as extratextual sources may not overcome a statute's plain terms. *Id.* at 2469. Accordingly, even if Tulsa proves correct that reversing the district court's decision will lead to disruption, we must base our decision on the plain text of Section 14. If

34

the system in place in Oklahoma proves untenable, "Congress remains free to supplement its statutory directions about the lands in question at any time." *Id.* at 2481–82.

Because, by its plain text, Section 14 of the Curtis Act no longer applies to Tulsa, the district court erred in granting Tulsa's Rule 12(b)(6) motion to dismiss Mr. Hooper's declaratory judgment claim.

### B.    *Appeal from the Municipal Court*

Mr. Hooper contends that because Section 14 no longer grants Tulsa jurisdiction over municipal violations committed by Indians, the district court erred by dismissing as moot his appeal of the municipal court's denial of his application for post-conviction relief. Although we agree the district court erroneously dismissed Mr. Hooper's appeal as moot based on its analysis of Section 14, we determine the district court lacked jurisdiction over Mr. Hooper's appeal of the municipal court's denial of his petition for post-conviction relief.

As noted above, we have an "independent duty to assure ourselves of the district court's subject-matter jurisdiction." *Planned Parenthood of Kan.*, 882 F.3d at 1211. Mr. Hooper argues in his complaint and response to Tulsa's motion to dismiss that the district court had jurisdiction over his appeal from the municipal court's denial of his petition for post-conviction relief based on (1) the appeal procedures pursuant to Section 14 of the Curtis Act and (2) federal question jurisdiction under 28 U.S.C. § 1331. Because Section 14 no longer grants Tulsa jurisdiction over municipal violations committed by Indians, and accordingly the appeal procedures under

35

Section 14 do not apply to Mr. Hooper's application for post-conviction relief, we are left only with Mr. Hooper's argument that the district court has jurisdiction over his appeal because it presents a federal question. Section 1331 grants district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." As recognized by the Supreme Court through the *Rooker-Feldman* doctrine, § 1331 "is a grant of original jurisdiction[] and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to [the Supreme] Court." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002). Accordingly, the district court could not exercise subject matter jurisdiction over Mr. Hooper's appeal from the municipal court's denial of his petition for post-conviction relief, an appeal from a state court decision, even if it involves a federal question. *See D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 476 (1983). We vacate the district court's dismissal of Mr. Hooper's appeal as moot and direct the district court to dismiss Mr. Hooper's appeal for lack of jurisdiction on remand.

### III.    CONCLUSION

We REVERSE the district court's grant of Tulsa's Rule 12(b)(6) motion to dismiss Mr. Hooper's claim for declaratory judgment, VACATE the district court's dismissal of Mr. Hooper's appeal as moot, DIRECT the district court to dismiss Mr. Hooper's appeal without prejudice for lack of jurisdiction, and REMAND for proceedings consistent with this opinion.